24-5249 Jason Jones v. Fluor Facility and Plant Services, Inc. Oral Argument, 15 minutes per side. Mr. Buecher for the appellant. Good morning. May it please the Court, Tony Buecher for the appellant, Jason Jones. I am reserving three minutes for rebuttal. Your Honors, this is an employment case arising out of Jason Jones' employment with Fluor in southwestern Kentucky. It's a race discrimination case, plain and simply. Jason Jones was moved to night shift at Fluor, and from the moment he arrived, he was subjected to racial slurs, racial jokes, and racial stereotypes. That behavior continued for approximately one month before Jason Jones had finally had enough. He stood up for himself, and he asked that it stop. A meeting was subsequently held with the crew. And now, mind you, this is a crew of six people. There is one person of color, Jason Jones, on that crew, and five Caucasians on that crew. There was a meeting held on November 9th of 2020 where the crew members were instructed to stop using this type of language, that it was offensive, and that they should stop it. Instead of accepting that, one employee in particular stood up and actually asked if he could still use the N word in jokes, because that's just the way they talk. When they were told that that's not acceptable and that would never be acceptable, they honored that going forward. And instead of using the racial slurs, they completely isolated him. They didn't isolate him for a day, they didn't isolate him for a week, they didn't isolate him for a month. They isolated him for the remainder of his employment on the night crew until he was ultimately terminated. In granting the motion for summary judgment, in analyzing hostile work environment cases, there are three basic tenets that Judge Clay identified two months ago in his opinion, Schlosser v. B.R. Havelis. And these three basic tenets, and these are well known, these are not new. Whether harassment is sufficiently severe or pervasive to create a hostile work environment is quintessentially a question of fact. Number two, when considering whether conduct is sufficiently severe or pervasive to create an actionable hostile work environment, one must consider the totality of the circumstances. And three, when considering the totality of the circumstances, the fact finder can and should consider both, Schlosser was a sexual harassment case, said both sex-based comments or conduct and non-facially neutral comments if there is some circumstantial basis for inferring that the facially neutral incidents were discriminatory. Now, in the opinion, granting summary judgment in this case, the district court pays lip service to these three basic tenets and then seemingly disregards them completely when doing the analysis. And what I mean by that is when there are questions of fact, those are questions for the jury. Those are questions for the fact finder. The district court put themselves in that role and took over that role as the fact finder and concluded that it wasn't sufficiently severe to create a hostile work environment. In doing that, the court did not take the totality of the circumstances into consideration. In doing that, the district court plucked a few of the racial slurs that were said within the first month of Jason's time on the night shift. He plucked a few of those comments and said these were isolated and not sufficiently severe or pervasive to create a hostile work environment. In doing that, the district court ignored the isolation that followed. Well, can we get some clarity on that? Because one of the things that, unless I misunderstood from Fleur's briefing on this, what they said is that some of the information that we have before us in the appellate court were not things that were brought up in the district court, in particular the number of times the N word was used and the context in which it was used. As I understand it, the district court had the one instance of Walpole using the term and not the other. Can you just give some clarity on that? I was unclear from reading the briefing. In terms of, and just to be clear on your question, Your Honor, in terms of how many times the N word was identified in the briefing? No, not actually what happened. What the district court heard. Right, okay. So in the briefing, you're right, was the one time that the N word was used in front of Jason Jones. There's evidence in the deposition transcript that the N word was also used in that subsequent meeting. But you are correct in that the N word in our briefing, we focused primarily on the N word that was used in the presence of Jason Jones. And so, yes. What did we do with that, though? If you didn't raise that before the district court and say, hey, because you're talking about the totality of the circumstances. And we read this and it's rife with a lot of activity. If the district judge never heard that, what are we to do with it? I think what ultimately, if it was just the use of the N word and all of this stopped within the first month, I think what we would say is that we probably wouldn't be here today. And that's part of the problem. So with the information that the district court had, the district court was still aware of what happened in that first month. Which, again, if it stops at that point after they are reprimanded, we are probably not here today. But what the district court had was the information related to that isolation that went on after that. And in its ruling, the district court says social isolation is not, they cite to the Reed case, Reed v. Procter & Gamble. They say in Reed, the court refused to consider isolation as evidence of discrimination, noting that the record was devoid of evidence to indicate that Reed was subject to unfriendly treatment by some colleagues. That's not the case here. Mark Thornberry, the night shift supervisor, acknowledged in an email to the HR department in May of 2021 that he had been given the cold shoulder ever since he arrived on night shift. In addition to that, Mr. Thornberry testified in his deposition that they refused to communicate with him as it relates to his job. So this isn't mere social isolation. This goes to the terms and conditions of his employment. This goes to how it affected his job, making him walk from job site to job site instead of picking him up in these carts or buggies that everybody else is using. Walking away when he walks in a room. In his opinion, the district court wants to say that these are not severe or pervasive. How is it not pervasive if it goes on every day for a period of seven months? This evidence of night shift employees allegedly turning their backs on the plaintiff when he entered the break room and denying him rights on these shared buggies around the work site was this kind of evidence and information before the district court in connection with the motion for summary judgment? It was, your honor. The district court references the buggy rides in his opinion, I believe. I don't have it in front of me to say expressly where he identifies the buggy rides. My concern with this is that the district court sets himself into this fact finder role. What we believe is that there was enough evidence before the district court to conclude that it created a question of fact. It should have gone to a jury to make this decision instead of having him impart himself into that role of the fact finder. Again, the district court makes the big distinction between the race-based and the non-race-based discrimination or harassment. Again, if there is some circumstantial evidence for inferring that facially neutral incidents were discriminatory, those things must be considered in totality of the circumstances. Again, I will point to the fact that Jason Jones was the only person of color on that night shift. Jason Jones, there is no evidence that any other people were denied buggy rides, were passed over, that they were walked away from when they walked in the room, that they were not given assistance with their work. Jason Jones is the only, as the record reflects, Jason Jones is the only person that experienced that. And so based on that alone, you can infer that there is a race-based element to this that created a hostile work environment. But you're not relying only on that, right? Pardon? You're not only relying on that, that he's the only African-American, right? No, I think the fact, but you also have to place in the fact of what he was subjected to in that first month of employment. So yes, when you place what he was subjected to in that first month, it was a transition. Okay, so we can't call him the N-word. We can't call him a rapper. We can't ask if he plays basketball or why didn't he play basketball. We can't apply these social stereotypes to him. So if we can't talk the way we talk, we're just going to ignore him. And we won't help him. We will make his life miserable on this shift. What about the second piece, which is the employer's liability? The employer's liability, I tie that directly to Mark Thornberry, the night shift supervisor, who was, frankly, he was a friend of my client. He was the one who held the meeting on November 9th on 2020 and said this stuff has to stop. But then when it transitioned into the cold shoulder behavior, Mark Thornberry started taking notes. But he didn't do anything else. He never stepped in to address it to stop it. Mark Thornberry, the testimony is that when he... Let me ask you a question. Did the district court address that issue, employer liability? I don't believe it was addressed at that level, as I sit here and recall. Because I think it was more just saying that it wasn't sufficiently severe or pervasive enough to create a hostile work environment. And again, I just... So you're saying, go ahead, so the employer liability, because he did act, right? He did what, pardon? Thornberry did act. He did act initially. He held a meeting after that first month. But then in the subsequent months, when he was being isolated, ignored, denied the buggy rides, not being provided assistance in his work, he did nothing. He took notes. He allowed that isolation to continue. So I guess Mark Thornberry's position may be, well, they weren't cussing, so I didn't care how they were treating me. Or they weren't calling him the N-word, so I don't care how they're treating me. But at the end of the day... The investigation kicked in in March of 2021 after Jason Jones was falsely accused of a safety violation. Mark Thornberry confirmed that Jason Jones did not have a safety violation. But in the course of that safety violation, that is when management above Mark Thornberry became aware of the hostile work environment that Jason Jones was subjected to throughout his employment. So yes, when that investigation was conducted, that investigation wasn't conducted until seven months after that isolation started. And in the course of that, they concluded that there was no hostile work environment. They also concluded that there was no safety violation. Well, when you say they, you mean the company's management? The HR department. And frankly, right after that opinion came out, that's when he filed the EEOC. He just said that's when they became aware. So if they weren't aware before that, what were they supposed to do? Mark Thornberry is a person of management. He is a manager. He is a supervisor. It is his job and duty as a supervisor to take prompt and appropriate corrective action. Mark Thornberry did nothing. And frankly, neither did HR once they were put on notice of it. I assume Mr. Thornberry's deposition was taken prior to summary judgment. Is that right? That's correct, Your Honor. What did his deposition show in terms of Mr. Thornberry's communication about the problems concerning the plaintiff to his superiors, to his upper management? There was none. What he testified to was that he took notes. He kept a notepad. But then he gave up, just got frustrated with the way it was all going, and quit taking notes in April. But that's the time that HR got involved. Once HR got involved, they did take a statement from Mark Thornberry and Jason Jones. But prior to that, again, for the seven months leading up to that, Mark Thornberry just took notes. He didn't do anything to address the problem. And again, and I see my time is up. Yes, your time is up and you'll have your rebuttal. Thank you. May it please the Court. Good morning, Your Honor. Scott McIntyre, a Baker Hot Stutler on behalf of the appellee floor. Let me first address a couple questions that your Honors had. I took the deposition of the plaintiff. I was there. My esteemed opponent was not. The question Judge Clay asked about the buggy, here's what Mr. Jones said in his deposition that we informed the district court of. Not attributed to race. I asked him directly. He testified he would be guessing when asked why his co-workers drove off. Mr. Jones literally said he would be guessing. Not a race issue. This was during COVID, Your Honor. This was during social isolation. There were some safety complaints about Mr. Jones wearing headphones. Very safety-sensitive environment. This is a factory. Let me stop you on that. When you say it's not a race issue, what in Fleur's mind would something that is neutral that happens, but in close proximity and around the times that other racial incidents happen, so that we can make the link? Let me be more clear in my question. Is it necessary that the actors actually say, hey, I'm doing this because of your race? Short of that, aren't there reasonable inferences to be made? I would say there are not, respectfully, Your Honor. Good question. I will answer that by pointing to one of Judge Clay's opinions. Strickland versus City of Detroit. That involved the allegation of being ignored by co-workers. An African-American police officer, Judge Clay, as you recall, the question was whether it was severe and pervasive. And you very clearly, in that opinion, differentiated between co-workers ignoring someone, which is disrespect, which is offensive but not severe or pervasive, versus management condoning it. A huge difference. And you went on to cite cases in there comparing and contrasting the difference between co-workers. Title VII is not a civility code. The law is clear coming from the Supreme Court. Harris, Farragher, Ellerth, the law couldn't be more clear on that in terms of that's why this court applies such a high standard. And we're dealing with a question about a buggy that was vague. And I literally asked the plaintiff. So to answer your question very directly, Your Honor, Mr. Jones didn't attribute it to race. So he did not make the inference. That's the most powerful evidence, Your Honor. Mr. Jones is not the ultimate fact finder, even in his own case. And we have to look at the factual circumstances of each case. And here the issue is whether the district judge sort of jumped the gun based upon the quantum of evidence that was available if we look at the totality of the circumstances. Yes, Your Honor. It's an objective standard. And I strongly disagree that the district judge jumped the gun at all. To your question, Judge Davis, a huge number of what was briefed was not even before the district judge. That's why he cited Sixth Circuit fueling case, the Grand Trunk case. That was a Chief Judge Sutton case that talks about these vague and specific claims. No time frame. The retaliation component, you couldn't find retaliation. There was no time frame mentioned. There are two claims in this case, too, by the way. Race-based harassment and race-based retaliation. I don't think there was an intentional reference to discrimination. There's none of that. Termination is not in this case. There's no allegation of wrongful termination. There's a separate case pending, Your Honor, by Mr. Jones that we're defending right now that involves an alleged wrongful termination. He was terminated, and this is all in the deposition. You can see this because Mr. Jones respectfully has tried to combine cases here, and we objected to that, so we actually question him on this. He threatened to kill his co-workers, literally. He threatened to kill his co-workers, and that's the reason he was terminated. Way beyond this, there's no allegation that had anything to do with this, so I want to make sure the record is clear on that. There's a police report, and there was actually a warrant, a Tennessee medical nurse facility. He had a car accident. He was taken to the facility. They called and said he's made an allegation to kill co-workers, and that was Logan. I'm really confused. Yes, Your Honor. Why are you talking about that? Because he mentioned termination, and I want to make sure Your Honors aren't misled to think that he was terminated. No, he said from a certain point until he was terminated. The only reason I mention it, the brief also mentions termination, and I want to make sure Your Honor knows that that's not part of this case. It has nothing to do with the case. That's my only point in mentioning it, Your Honor. Let me start here by saying the district court issued a well-reasoned opinion. He had over a year to take discovery, Your Honor, and there are two claims here, and there were a full opportunity, two very good attorneys on the other side, and the district court did not jump the gun at all. It issued a well-reasoned opinion. So far from hostility, plaintiff testified at his deposition he had a good relationship with management, literally said a good relationship with management. That's deposition page 30. I'm sorry. Good relationship with management, page 37. At what point in time? At all times, Your Honor. That's a good question. This is not, this Mark Thornberry who was described as his friend, he's not a manager pursuant to Vance v. Ball State. He is an hourly employee. They worked together at a previous job. Mr. Thornberry recommended the plaintiff. This is all at page 132 and 33 of the Thornberry deposition. Well, didn't Mr. Thornberry have some supervisory responsibilities? No, sir, Your Honor. No, sir. If you look at page. Why didn't he call that meeting and admonish? He was a night shift lead. This is directly based on Vance v. Ball State. And I ask him directly, no power to hire, fire, no power to do anything of a tangible employment. This is an hourly employee who was friends with the plaintiff who referred him to the job. That was it. Actually, plaintiffs sometimes took the lead on the night. So this was not a supervisor at all. And you heard opposing counsel say, Mr. Thornberry never told HR. So here's how this came up. Safety violations.  So this gentleman worked at Logan, the largest employer in Logan County. Logan Aluminum. That's my client's client. So Floor does maintenance, so they're a vendor for Logan. So that's where this, they had a little shop inside the plant at Logan. So Logan employees complained he was not working safely. He was at heights, supposed to wear a harness. Some of his co-workers at Floor complained and said, look, he's going to kill himself here. He's not wearing a safety harness. So they complained. So supposedly this is after they hit it or something and wouldn't lend him their harnesses? No, Your Honor. The testimony for Mr. Jones was that they were helpful. They tried to train him. And he didn't like being trained. You know, this is a man who I ask him, where did you work before? He couldn't tell me where he worked before. You're saying that Mr. Jones testified that they were helpful and wanted to train me, but I don't like being trained. Mr. Jones was... I'm asking you, did you just say Mr. Jones testified? Mr. Jones was resistant to training. I took his deposition and there was friction. Part of the issue was one of the co-workers didn't like it that he was hired and was paid more. A certified welder with 14 years' experience, Mr. Jones was paid more. So there was complaints from the co-workers. So the first complaint was not from Mr. Jones. It was from the co-workers. And this whole written complaint in March of 2021 was because Mr. Jones was brought into the office about the safety violation complaint. Okay, now can you answer the question? Are you saying Mr. Jones testified that he doesn't... He didn't want to be trained? He didn't say he didn't want to be trained. He said helpful. He testified that folks were helpful, Your Honor. And he said, but I don't want to be helped? He didn't come out and say, I don't want to be helped. I don't mean to say that. There was friction about the help. He said management was helpful and he also acknowledged that co-workers tried to train him. And the co-workers didn't think... He was the new guy on the shift and they thought, look, you need to take direction for me. The co-workers, there was that. That's the reason I mentioned it, Your Honor. There was back and forth about the new guy. Not race related. Nothing to do with race. You know, counsel, all of that would be plausible if there wasn't this period of time where they're clearly harassing him because of his race. I respectfully disagree. There's zero harassment because of his race. Zero. The only mention, there was the one word, term of endearment. He literally called it a term of endearment by this teenager. Let me interrupt you on that because I noticed that in the briefing. Did he take it as a term of endearment or did he say that Mr. Walpole, in stating it, meant it as a term of endearment? Here is his four-page statement, his words. He literally says he took it as a term of endearment. This is literally, and I asked him at his deposition, what do you mean? It says he took it as a term of endearment? Yes. Let me see. I don't want to take a preposition out of context. He took him to mean it as a term of endearment. He did not complain about it. He referenced it. He also said that he wanted, he thought that at some point his coworkers would accept him and so he didn't want to complain because he thought that, well, if I tough this out, eventually they'll accept me, correct? He did say that in his statement. He said he didn't want to get his 19-year-old teenager coworker in trouble. And he knew that the 19-year-old meant it as a term of endearment? A term of endearment. Regardless of whether or not he thought it was a term of endearment coming from that individual, correct? No. Here's what he said, Your Honor. He said, I thought he meant it like we was friends, his direct quote. Right. But we're not friends. Is that what the follow-up was? Actually, no. Like we said it to each other all the time. Did he say that he, please just read it. Well, at his deposition, I was. Is that a transcript or a summary that you're looking at there? This is an exhibit to the deposition. I'm just asking you if it's a transcript or some sort of summary. Yeah. It's not a literal transcript, is it? It's a statement. Yes, this is his handwritten statement that he gave after he was called into the office about the safety complaint. This is in Mr. Jones' writing dated 3-30-21, Your Honor. He says, in his mind, you can tell he thought it was par for the course. He used it as a, quote, term of endearment. I think there's a quote there. He used it as a term of endearment. He's speaking of Mr. Walpole, correct? I'm sorry? He's speaking of what he thought that Mr. Walpole took it as, correct? Well, this is his perception of what he thought. Yeah. He used it as a term of endearment. I couldn't tell if he was aware. He goes on to say, I couldn't tell if he was aware of the mistake he made. He didn't regard it as intentional. Of the mistake he made from a business, can't read his writing here, standpoint, I think he said, or aspect, a business aspect. Alex was, I believe, 19 or 20. I didn't think it was right to take his future working opportunity, so I said nothing. So he raised this for the first time months later. He knew how to complain if there was an issue. He said also in this statement, problem solved. They moved him. They moved him away. He never worked with him again. Mr. Jones said, problem solved in this literal statement. I'm a little concerned about the accuracy of some of these factual statements. Going back to the matter of the safety harness, supposedly Jones testified that he could not access a harness because his harness had seemingly disappeared and his coworkers refused to let him borrow theirs, and then it became an issue in the workplace that he didn't have a, that there was a safety violation because Plaintiff didn't have a harness. I mean, some of these disputed facts, you're giving us a version as though there's only one version of some of these facts, and it seems as though some of these things are disputed. Well, I would disagree, Your Honor. There was no disappointment. Remember, and opposing counsel conceded that, he never had any consequences. Well, what does whether there was discipline have to do with what we're talking about? Nothing negative happened to Mr. Jones about the safety issue. He was investigated, and as opposing counsel just acknowledged, he was not found to have engaged in any wrongdoing. Well, he was called in and subjected to a verbal counseling with Supervisor Ott Riley, and so he did suffer some negative attention as a result of the whole matter. Well, I would disagree that there was negative attention, and the context of this is Logan, the customer, had complained about safety issues, and there was ongoing complaints about goggles not being worn, and there's no dispute that he didn't wear the goggles. That was never an issue that he should have worn. Well, he was wearing headphones, and he shouldn't have done that in the buggy, and that was another safety issue. So there was ongoing protected safety complaints that the company couldn't just ignore. OSHA requires the company to look into safety complaints, Your Honor, and again, I can't emphasize enough that nothing – during one episode talking about problems in the operation of the crew, of which that safety harness matter was an example, then the matter purportedly got around to discussing the use of the N-word, which led to Jones and Thornberry filing witness statements with the company discussing the use of racial epithets on the night shift crew and other conflicts and the ostracization of Jones. I mean, there was a lot of back and forth there about racial problems involving Mr. Jones, which was notable since he was the only non-white person there. There was another African American who left. I will say that, as opposing counsel acknowledged, Your Honor, there was only one focus, which was Mr. Walpole. In the briefing before, to Judge Davis, your point to the district judge, there was focus on this Mr. Walpole term of endearment statement. Another one who left. Left when in relation to these events? I mean, you keep throwing these little dots in here. Well, I'm trying to satisfy your question, Your Honor, because this is not a disparate impact. This is not a question about how many African Americans worked there. Well, the person who left, when did that occur and what did that have to do with this case? That was in response to your question, he was the only one here. It was not developed. There was no allegations that he was ever discriminated against. So the point is, this is not a case. Yeah, but you didn't answer my question. How does the other African American, having been there, factor into the facts of the case? Here's how it factors in. There's no comparator evidence. I ask him directly at the deposition, do you have any comparators? Me too. There's no instance of any other African Americans being mistreated. There's no evidence that African American was mistreated. Well, when was that other African American employed at the company? During the same time, shortly before. I think he said he was on the night shift for a while. There was no allegation that he was ever discriminated against, Your Honor. So I only mention it because you asked, you said he was the only one. There's no evidence that who was discriminated against? This other African American. So there's no evidence of any discrimination here. This is not a discrimination case. This is not a comparator case. I ask him, do you have any comparators? No. Do you have any instance of a white person being treated better? No. All of that is the context of this case. And HR, let me talk about HR. To your point, Judge White. If he's claiming that he's the only one being ostracized, and he's the only black person there, then some implication might be that there's a racial component to all of this. Your Honor, he was not ostracized. Mr. Thornberry was his good friend. You heard opposing counsel say he recommended him, hired him. Well, that's what was alleged. I mean, neither you nor I are fact finders about all that. Well, Mr. Opposing Counsel just said it a minute ago. They were friends, and he recommended him. That doesn't mean he wasn't ostracized because he was friends with Mr. Thornberry. I don't follow that connection you're making there. Because he was friends with Mr. Thornberry, that translates into meaning he was not ostracized. Those are two different things. There was no ostracism, Your Honor. He testified. He couldn't say why the buggy, why he was not picked up in the buggy. This was during COVID. Let me ask you, to your point, Judge White, about liability, HR, he was never threatened, never had his pay reduced, never demoted, never suspended, never turned down for a job. He said HR was great. Here's a direct quote. Pleasant, friendly, cordial, and professional. After this four-page statement, they followed up with him four times. They did a thorough investigation. Ms. Dawn Gallegos referred the matter to Stephanie Baker, her peer, to make sure she hadn't missed anything. Ms. Baker called, spoke with Mr. Jones. Mr. Jones was clear that he didn't have a problem with the investigation, Your Honor. He said, Your Honors, Ms. Gallegos' investigation was fine. He said, Ms. Baker, I don't need to talk to you. So there's no basis for liability here. The standard for co-worker Oh, I'm sorry, Your Honor. Yes, the standard for co-worker retaliation, as Your Honor said, in Strickland, for example, it's condoning. Did management condone this? And HR looked into it, and he literally said, there's nothing here. He told the EEOC, this is quieted down. There's nothing here. So HR didn't bury their heads in the sand. If there was anything here, HR would have stopped it, just like he said that the N-word was stopped. There was nothing ongoing. This isolation was not enough, not severe or pervasive, based on Grand Trunk, based on Clay v. UPS, based on all the cases we cite, Phillips v. UAW. The P&G case had a noose, literally a noose. And the court said, that's not enough. That's not enough. And the supervisors were involved in that case. I'm going to have to stop you. Yeah, thank you, Judge. Thank you, Judge. I'm going to try to be in some kind of order, but I just want to address a few of the things said by counsel. Can you start with that last point? Counsel's point that Mr. Jones said that he was satisfied with the investigation. You made a point in your briefing that there were questions that were not asked, and I kind of thought that maybe what you were going to was that this investigation was kind of not a complete investigation. But I'm just curious as to your response. When you say that he was satisfied with the investigation, I don't see how they can come to that conclusion when immediately following the investigation, he filed his charge of discrimination with the EEOC. Because they took, I think he was satisfied with the way he was treated. The way he was, the way they communicated with him. But as far as being satisfied with the results of the investigation and any kind of disciplinary action taken as a result of that investigation, I think the fact that he filed an EEOC charge immediately after that would suggest otherwise. Opposing counsel also addresses, he focuses on this management issue as the fact that HR, once they became involved, that they did some type of investigation. And he completely wants to ignore Mark Thornberry's position in this. Mark Thornberry identified himself in his deposition as the night shift supervisor. That, and again, in the type of work they were doing, they were maintenance people in a machine facility. If someone is identified as a night shift supervisor, it is certainly reasonable for Jason Jones to believe that this person is my boss and that this person is going to take up for me and to address any problems I have in the workforce. Remember, night shift. HR doesn't typically work during the night. HR is a 9 to 5 sort of thing. The people that Jason Jones interacted with knew about it. They knew it was going on for 7 months and they did nothing about it. And I did not bring this up in my opening and I did not want to bring it up, but he brings up this threatened to kill his co-workers and that's why he was fired. There was no threat to kill his co-workers. Jason Jones hurt himself, had a physical injury. He was sent to the hospital. He underwent a mental health assessment during the course of that. This has nothing to do with anything. Thank you. Just because he brought it up, I don't know why he brought it up. I agree with you. At the end of the day, again, with the social isolation that he suffered and the refusal to get assistance with his work, that demonstrates a pervasive hostile work environment that Mr. Jones endured for 10 months. And because of that, we think there is sufficient evidence that there are questions of fact as to whether, at a minimum, there are questions of fact as to whether or not there is a hostile work environment. And for that reason, this case should have been presented to a jury, a fact finder, to make those decisions and not decided by the court as a matter of law. I thank you for your time. Thank you very much for your arguments and the case is submitted.